**GENERAL ELECTRIC COMPANY, Plaintiff, v. UNITED ELECTRICAL RADIO AND MACHINE WORKERS OF AMERICA, et al., Defendants.**

Common Pleas Court, Cuyahoga County.

No. 559,712.  Decided January 29, 1946.

Jones, Day, Cockley & Reavis, Cleveland, for plaintiff.
William J. Corrigan, Esq., Cleveland, for defendants.

## OPINION OF THE COURT
### (Orally)

By ORR, J:

This matter comes before the Court upon an application for a temporary restraining order. The matter grows out of what is commonly known as a labor controversy. This involves several plants of a company or corporation known as the General Electric Company. These plants are located within this County. The strikers are represented by a Union. This Union is a large national Union. The company is, likewise, national in its scope. Therefore, it is quite apparent that nothing that we can do here will settle the major controversy between these parties; that is, their wage dispute. It is rather unfortunate in this enlightened age of ours that we do not have procedures which make it possible to settle controversies of this nature in a reasonable and orderly manner. Our Congress is now meeting and is considering legislation which, perhaps, will accomplish that, or, at least, go a long ways toward accomplishing it. No doubt the conduct of the parties in the various controversies which are now raging throughout our country will have some bearing on the legislation which is now before the Congress.

In the strike which we are considering, both parties to this lawsuit have certain rights and certain duties. The workers who are on strike have the right to strike, they have the right to join a Union, they have a right to peaceful picketing. On the other hand, other people have rights, also. The owners have certain definite legal rights, and we must remember that there has been a change in our concept of corporations. There was a time when the owners, or the owner, of a corporation, large company; would consist of, perhaps, one man or a small group of men. That day is gone. The day of the Carnegies and the Rockefellers and the Fricks and a number of others, that day is gone. We find now, instead of one man or a few men owning a company, that hundreds of people, perhaps thousands of people, are the real owners of the company, and I presume that in this company, this corporation, there may be hundreds or thousands of people who have invested their money in the corporation and are, therefore, the owners of that corporation. They, perhaps, have invested their life savings. They may be depending upon their investment to see them through their declining years.

Now, these people have a right of property which must be protected.

There is another class of people who also have definite rights, and that is the employees who are not on strike. In a company the size of this, there are numerous employees. There has been no one here who has testified on behalf of the company that was not an employee. The stenographers, and nurses, bookkeepers, research men, even the manager, are employees of the company, and these people have a right to work, a right which is just as sacred, if not more so, than the right to strike; and in this particular case I am told that there are approximately 1700 of the workers of the General Electric Company, that is, 1700 out of 3300, or a little more than one-third of the employes of the company, who are not engaged in production but they perform other services. Now, these people have rights which it is incumbent upon this Court to protect, also.

I mentioned some of the rights which the Union has, which the strikers have. There are certain things which the law says very definitely they cannot do; for instance, they cannot mass picket, that is contrary to law; they cannot threaten, they cannot intimidate people; they cannot do violence to anyone; and they have not the right to seize a plant or prevent people who have lawful business from entering and leaving the plant without let or hindrance.

The issue in this case is a very simple one. This Court has permitted a great deal of testimony because we wanted to be sure that we understood the background of this entire controversy. The fundamental issues are not difficult. The company complains of the strikers, says that they are mass picketing, that their property is being endangered, that people who have lawful business in the plant are not permitted to enter.

It is perfectly clear from the testimony which we have heard, both by way of affidavit and from the witness stand, that there are certain processes of this company which are very valuable and which must be preserved. There is testimony, for instance, of one furnace, which if it was permitted to cool, would result in a loss of $100,000, and that is a very serious loss; but more important than that is the fact that if that furnace cools off and cannot be used, that it will take perhaps six months to put that plant in operation. Therefore, if that should happen, these people who work in that plant would be the real sufferers. They would suffer far more than anyone else.

Then there is the research and development department, the place where engineering work is done, where experiments are carried on, the place which is famous the world over as a place where great things are developed for the benefit of all of us. Now, I think in this case it is perfectly clear to the Court the importance of preserving this property, this vital property, so that when these men and women go back to work they will have a place to work in, so that their plant will not be damaged, so that research can go forward. I think it is clear to the Court, and I say that both sides recognize the importance of that.

There has been worked out between the Union and the company an arrangement thus far whereby this property has been maintained. I hope that that arrangement can in some way be continued.

The company also complains of strikers, and it says that they are guilty of mass picketing. Well, it is perfectly clear what happens at this strike, or what did happen or what is happening now. In the early days of the strike there were a great many people who turned out, and then as the strike grew or continued, according to the testimony of Mr. Haug, a certain number of pickets would report in the morning and for about two hours would indulge in mass picketing. That is what he called it. They would march around, these girls would march around in a circle, sort of a close-order drill. Now, he says the chief purpose of that—he said there were other purposes—one of them was to inform the public there was a strike going on, but he said that the chief purpose was to inform or to stimulate the morale of the strikers. Well, it is none of my concern, I suppose he knows, but I just entertain the belief that marching a group of girls these cold mornings around in circles is not particularly conducive to building morale. At this picket line, after that period of mass picketing is over, there is maintained what Mr. Haug described as a skeleton organization; that is, four or five people would picket for the rest of the day. In some places the company was kind enough to provide rather comfortable quarters for these pickets.

Now, there hasn't been any violence of any severe nature; that is, there have been no blows struck. These affidavits indicate that there have been threats, there has been intimidation, there has been some pushing and shoving, there has been some rocking of automobiles, there has been some jeering; but to the credit of both sides, be it said that there has been no actual violence. That may be due in a large measure to the fact that these people who were not permitted to enter the

plant made no issue of it, they acquiesced in the demand of the pickets that they do not attempt to enter. But, in any event, violence must be prohibited or prevented.

So far as the picketing is concerned, if it were not for the fact that as a part of this picketing people who have a right to enter the premises lawfully are prohibited from doing so, I might be inclined to say that perhaps a limitation of pickets is unnecessary. But I believe in the interest of preserving law and order, and in the interest of the other matters which I will later discuss, that there should be some limitations upon the picketing. Under the showing which has been made here some courts might say that there should be no picketing, other courts might say that there should be one picket or perhaps two pickets. I am inclined to be more liberal. I am influenced very largely by the fact that the picketing the strikers have engaged in has not been marked with violence.

Therefore, I am going to permit five pickets at each entrance of each plant involved.

The real issue in this case may be very simply stated, and that is this: Does the Union have a right to determine who shall and who shall not enter and leave the property of the company? The Union takes the position that no one shall enter the property of the company unless that person has a pass which has been issued by the Union or approved by the Union, and the picketing thus far has successfully prevented anyone from entering the premises I have mentioned, unless that person or persons have been approved by the Union. I again point out that the Union has permitted maintenance men and others handling emergency matters to go through the picket line, but they kept out people who have a perfect legal right to enter the premises. I have here the affidavit of a young lawyer whom I know, who just the other day was in this court still wearing his country's uniform. He has a distinguished military record. He went to his place of employment, went to the gate wanting to go to work. He was forbidden to enter the premises. He turned away and as he did so he was booed and jeered. Now, I don't suppose that a young man who has been through what he has was greatly disturbed by that, but he shouldn't have had to suffer that indignity. I have another affidavit of a man who has worked for the company for 46 years, who reported for work and he also could not enter the premises. I have affidavits of stenographers, and nurses, engineers and many others who are not involved in this controversy in the slightest degree, no more than I am involved in it, and they wanted to go to work and they couldn't do so.

Those people have a right to work, have a right to earn their wages, they have a right to maintain their homes and families, and there is no law anywhere that gives anyone the right to deprive them of the privilege which they seek; namely, the right to work and the right to free access to these premises as long as they are engaged in lawful work.

Now, Mr. Haug described the conduct between the company and the Union as a warfare and pointed out that they had trenches, one on one side and one on the other, the parties fighting it out. I think his simile is an unfortunate one. I think a matter such as this should be settled not in the trenches, not by warfare, but by reasonable men sitting down and composing their differences. In no other way can labor matters be effectively handled. But even if this be warfare, certainly the rules of the game do not permit the seizure of a plant, and that is what, in effect, I think, is being attempted here.

We have spent a great deal of time during this case upon the question of arrangements which were discussed prior to the strike between the Union and management. I think those efforts were made in good faith by both parties. I think the workers and the managers wanted to work out some sort of an arrangement which would permit the physical assets of this company to be preserved intact until this controversy, the major controversy, should be settled, but, unfortunately, those arrangements failed. Now, it is not for me to say who was at fault in that. Suffice it is to say that they did fail. I would have been a great deal better pleased if these people had been able to work out among themselves some sort of an arrangement, then perhaps they would have both been satisfied with the result, but they did fail and now they come in before me and the only thing I can do is to determine their rights according to law and according to the evidence. I, however, express the hope that these people will remain amiable and will still try to work out some arrangement which will protect the property and prevent the creation of a dangerous situation.

Now, this company is not now in production. I, therefore, believe that the prayer of the petition for a temporary restraining order should be granted. I have already indicated the manner in which I think the pickets should be limited. I think there should be written into the Court's Journal Entry or decree a further provision that should the company resume production in those plants where this Union, the defendant in this case, is the recognized bargaining agency, that either party might have the privilege of applying to this Court for modification of the order. I leave that to them, but

in the meantime, this will be the order of the Court, and counsel may prepare a Journal Entry which will embody the suggestions of the Court.

No. 559,712. Decided March 28, 1946.

**OPINION**

By ORR, J:

Three individuals, whom we shall hereinafter refer to as the defendants, have been cited to show cause why they should not be punished as for contempt of court because of the violation of an order issued by this Court on the 30th day of January, 1946. On that day after due notice and a full and complete hearing, which hearing was attended by all of the defendants, the Court issued a temporary restraining order which provided, inter alia, that the defendants were enjoined and restrained from:

"1. From interfering in any manner, whatsoever with the plaintiff, its officers, agents, employes, representatives and others having business with the plaintiff, and from interfering by violence, force intimidation, threats or in any manner whatsoever, with those desiring to enter or leave the plaintiff's plants and premises.

"2. From in any way interfering with the access to the plaintiff's plants and premises by the plaintiff, its officers, agents, employes, representatives and those having a right thereto, or from interfering with, accosting, or restricting in any way whatsoever the ingress to or egress from the aforesaid plants and premises by the plaintiff, its officers, agents, employes, representatives and those having a right thereto.

"3. From protecting, aiding, abetting or assisting anyone in the commission of said acts hereinbefore restrained.

"4. From picketing the plants and premises of the plaintiff and all portions thereof, including the gates and entrances and at any other place and street where any portions of the plants and premises are situated and facing; and from loitering, grouping or congregating at or near any approaches or on public streets or highways adjacent to plaintiff's plants and premises, or in any place at or near plaintiff's plants where the employees of the plaintiff desiring to work enter or alight from conveyances in order to go to or leave from the plaintiff's plants and premises; provided, however, that the defendants shall be permitted to peacefully picket the plaintiff's plants and premises by five (5) pickets at each of the following entrances, to-wit:"

Among the entrances thus designated were the entrances of the plant of the General Electric Company at 1131-1133 East 152nd Street and 1175 East 152nd Street in the city of Cleveland, Ohio.

Before discussing the evidence in this case I should like to state that this proceeding has been instituted not because a judge has been offended or an individual displeased. It has been held since ancient times that proceedings in contempt are not to secure respect toward individual judges, but to uphold the majesty of the people, to insure the dignity of the courts and secure the uninterrupted administration of justice.

The evidence establishes the fact that pursuant to a resolution duly adopted by the Union a large number of strikers, and those in sympathy with them, assembled in the neighborhood of the Collinwood Post Office in the city of Cleveland, and marched in a procession to and past the plants of the General Electric Company located on East 152nd Street. That after passing the plants the procession returned to the entrance thereof and there a large number of those parading formed picket lines which revolved in a circular or elliptical

movement in front of the two entrances to the plants of the company.

It is the contention of the Company that this action resulted in barring from the plant those who desired to enter and leave; that the number of pickets was greatly in excess of the number permitted by the Court's order; that threats and intimidation occurred and in general that there was open and notorious violation of the Court's order. On the other hand it is the contention of the defendants that they did not intend to, nor did they, violate the Court's order; that they had planned a peaceful anti-injunction protest parade, and that the demonstration which they conducted was nothing more than that; that they did not violate the order of the Court with respect to the number of pickets, with respect to preventing ingress and egress at the plant, with respect to intimidation or violence, or in any other repect whatsoever.

The evidence is clear that on the mornings of March 5th and March 6th of this year, for approximately one hour on each of said days, a large number of men and women marched in a closer formation and in a circular movement at the entrances of the East 152nd Street plants of the General Electric Company in such a manner that the employees and others who had lawful business in the plants and desired to enter were prevented from doing so; that during said period of time the number of those participating in such demonstrations was between 150 and 300; that after the mass picketing was over, many more pickets remained than permitted by the Court's order; that the demonstrators were directed in their movements and activities by orders issued from a sound truck which had accompanied the demonstration on the first day and by other means on both days; that during this mass picketing there were threats directed toward those who desired to enter and acts of intimidation committed. That no violence occurred is due principally to the fact that few were bold enough to attempt to enter.

It is further established by the evidence that these defendants, all of whom had knowledge of the order, were active in planning, organizing, directing and participating in said activities of the strikers. It is proven beyond any doubt that the conduct of the defendants and those they led was threatening, intimidating and direct violation of the Court's order.

This Court is not called upon to defend its order, but it is deemed proper to remind the defendants that at the time this order was issued the Court pointed out to them that they, as citizens and strikers had certain rights; that among these were the right to join unions, to strike and to peacefully picket.

The Court also said at that time that there were others who had rights which must be protected, that among these were the owners of the company and the 1700 employees who were not involved in the labor controversy.

We repeat that it the duty of the Court to protect the property of the owners and to safeguard the rights of those employees who desire to work. These defendants have certain constitutional rights, including the right of free speech and peaceable assembly, but there are other constitutional guaranties such as the right of property and the right to work which likewise must be protected, and, as we stated at the time of the hearing, these are just as sacred as the right to strike. In addition to these rights the best interests of the public must be protected and safeguarded. While our courts have upheld the right to peacefully picket no court upholds picketing which is not peaceful, or which is intimidating, threatening or marked with violence. Likewise no court of law has ever given strikers the right to lay siege to a plant, establish a quarantine and keep out those who have lawful business therein or to determine who shall and who shall not enter a struck plant.

Knowing all this and after their rights and obligations had been made clear, these leaders of the strike saw fit to violate the court order. Sometimes in the heat of a labor controversy when feeling or passion runs high, things are said or done which thoughtlessly violate the order of the court. This was not a violation of that kind. This was not a thoughtless or unintentional violation which can be excused on the ground of passion or excitment. It was deliberately planned, widely publicized and directed with the precision of a military maneuver. Telegrams were sent inviting persons to participate. The minutes of the Union disclose the fact that not only was consideration given to the mobilization of the strikers for this demonstration, but that plans were made to arrange for bail bonds in the event some of the strikers were arrested. Those who are about to engage in a peaceful parade are not required to give consideration to the matter of bail. Such apprehension indicates a knowledge of the unlawfullness of their acts.

I am convinced that the great majority of the strikers at this plant are decent American citizens who believe in law and order and who deplore unlawful conduct. Our system of government is based upon law. Some reference was made during the course of this trial to an inscription upon the walls of this Court House. There is also carved upon this building the simple truth that "obedience to law is liberty."

If the time ever comes when the orders of our courts are not obeyed, then indeed our liberty shall perish.

This unfortunate labor controversy was important to many thousands of people, and I do not mean to belittle it, but it is insignificant in comparison with the importance of upholding law and order in our community, for truly a blow struck at our courts is a blow struck at Democracy itself.

These defendants have stated from the witness stand that this was a peaceful demonstration against injunctions in labor controversies and have said that it was their desire by this means to call the attention of the public to what they consider the injustice of the law with reference to injunctions. While we do not doubt that these men entertain these views with reference to injunctions, we do not believe that their primary purpose on the days in question was to conduct a peaceful anti-injunction parade. The Union which was a defendant in this case was the Union which led in the plans and preparations for the demonstration. It was the leaders of this Union who organized, directed and participated in the demonstration. They chose the entrances to two of the plants of the Company against which they were striking as the scene of these demonstrations.

They claim that they merely conducted a parade which went by the plant and returned, and then marched around in a circular movement in front of the entrances to the plants for approximately one hour before disbanding. To hold that such a demonstration was simply a parade would be most absurd. We do not believe it was such, and we do not think that these defendants expect us to believe it was nothing more than a parade. Even if this Court were so credulous as to believe this fanciful story that this demonstration was undertaken solely as a protest, it certainly cannot be denied that for one hour on the days in question these men participated in mass picketing in a violation of the Court's order. The strike bulletin issued by the Union refers to their conduct as mass picketing.

At the close of the first day's demonstration the strikers were instructed to reassemble on the following day for a similar demonstration and what occurred on the second day was very largely a repetition of what occurred the first day.

While we are concerned only with violations which occurred on two days, there is evidence that these demonstrations continued for another two days, and that even after the citation of this Court had been served upon at least some of the defendants they continued to violate the order of the Court.

It is to the credit of the defendants that their conduct indicates that they did not seek to violate permanently the injunction or to use their expression, to break the order of the Court. The violations occurred only at the East 152nd Street plants of the Company and other plants were not picketed unlawfully and the demonstrations continued only about an hour on each day. They contented themselves with a gesture of puerile bravado whereby they could attract attention to themselves and impress their followers with the fact that they were above and beyond the law. It is apparent from the testimony of Mr. Haug that one of the purposes of these demonstrations was to attract attention to the strike. He seemed to feel that there was a lack of publicity concerning the strike, that it was necessary to do something which would dramatize it and which would gain public notice. He further indicated that he considered the newspaper publicity which followed justified their conduct.

In their zeal these labor leaders have lost sight of the fact that if they are to succeed under our system of government in protecting and advancing the rights of those they represent, they must be law abiding themselves; that while our Constitution guarantees the right of free speech and free assembly, it does not tolerate disobedience to law, and that those who would seek to advance the labor movement by disobedience or disregard of law betray the confidence placed in them by those whom they represent. Our form of government provides an orderly and legal method by which changes in the law may be accomplished. It would indeed be unfortunate if the advances which have been made after a long and difficult struggle by organized labor should be jeopardized by disregard for law and contempt of court.

These men must understand that they cannot set themselves above and beyond the law.

The Court is of the opinion that the defendants and each of them are guilty of contempt of court and their conduct is contrary to the best interests of the community. Happily the labor controversy in which the parties were involved has been settled and the strikers have returned to work. That fact, however, does not purge these defendants of contempt. Their offense was against society and the offense remained after the strike was settled. If they are permitted to go unpunished for this offense and again they or others become involved in a labor controversy they might be emboldened to take more extreme means or go to greater length in disobeying legal authority. Such conduct would, if tolerated, grow and soon undermine our governmental structure.

The statute dealing with the penalty for this offense is as follows:

"Sec. 12,142 GC. Punishment if found guilty. The court shall then determine whether the accused is guilty of the contempt charge. If it be adjudged that he is guilty he may be fined not exceeding $500.00 or imprisoned not more than ten days, or both."

While the Court is of the opinion that the gravity of this offense is such as to justify the extreme penalty of the statute, the Court also believes that these men have, through this experience in Court, acquired a more proper conception of the necessity for and importance of obedience to a judicial order; we also entertain the belief that they may be brought to a full realization of the necessity for respect of law and order without imprisonment. The Court further believes that in a matter such as this, certainty of punishment is more important that severity of punishment and so shall, therefore, not sentence them to imprisonment, but shall be content with the imposition of a fine. I therefore sentence each of these defendants to pay a fine of Three Hundred Dollars ($300.00).